UNITED STATES of America,
Plaintiff–Appellee,

v.

Ricardo AHUMADA–AGUILAR, aka Ricardo Ahumada; aka Ricardo Alfonso Hernandez, Defendant–Appellant.

No. 96–30065.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 5, 1996.

Memorandum Decided Sept. 19, 1997.

Withdrawn Oct. 2, 1998.

Decided Sept. 2, 1999.

Jay W. Stansell and Michael Filipovic, Assistant Federal Public Defenders, Seattle, WA, for defendant-appellant.

Donald M. Reno, Jr., Assistant U.S. Attorney, Seattle, WA, for plaintiff-appellee.

Before: SCHROEDER, ALARCON, and KLEINFELD, Circuit Judges.

Opinion by Judge SCHROEDER; Dissent by Judge KLEINFELD.

## ORDER

SCHROEDER, Circuit Judge:

The panel as constituted above has voted to grant the petition for rehearing and the attached opinion is ordered filed.

## OPINION

Ricardo Ahumada–Aguilar appeals his conviction on two counts of illegal reentry by an alien with prior felony convictions, 8 U.S.C. § 1326(a) and (b)(1). Ahumada–Aguilar argues that he is not an alien because his father was a United States citizen at the time of Ahumada–Aguilar's birth in Mexico to a Mexican citizen mother. The controlling statute provides that in the case of a child born "out of wedlock" whose father is a U.S. citizen and mother is an alien, the child to establish citizenship must show that the putative father has agreed to provide financial support to the child, and has acknowledged paternity or that paternity has been legally declared. *See* 8 U.S.C. § 1409(a)(3) and (4). There are no such requirements where the child is born to a U.S. citizen mother and alien father. *See id.* § 1409(c). Because Ahumada–Aguilar failed to satisfy the provisions of § 1409(a)(3) and (a)(4), the district court concluded that Ahumada–Aguilar is not a U.S. citizen. He contends that he is entitled to citizenship because § 1409(a)(3) and (a)(4) are unconstitutional as violative of his now deceased father's equal protection rights. We agree because a majority of the U.S. Supreme Court has effectively so declared. *See Miller v. Albright,* 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998).

A panel consisting of Judges Alarcon, Norris, and Kleinfeld initially filed an unpublished disposition in this case affirming the district court on September 19, 1997. Following a petition for rehearing, the panel withdrew submission of the case to await the Supreme Court's decision in *Miller.* In the meantime, Judge Norris retired from the court, and Judge Schroeder was drawn to take his place on the panel. Having now considered the separate opinions in *Miller,* we reverse Ahumada–Aguilar's conviction. Because we resolve Ahumada–Aguilar's equal protection claim in his favor, we need not reach the other issues he raises on appeal.

## FACTS

According to her affidavit that is not contested, Ahumada–Aguilar's mother, Genoveva Hernandez, met Frederick J. Deutenberg in a restaurant in Nogales, Mexico in late December 1970. At that time, she was 19 years old and a citizen of Mexico. Deutenberg was 50 years old and a citizen of the United States of America. Hernandez and Deutenberg traveled throughout the United States from January to June 1971.

Sometime during the spring of 1971, Hernandez became pregnant. Deutenberg was the only person with whom she had sexual relations in 1971. When she told him that she was pregnant, Deutenberg became angry. Hernandez told Deutenberg that she could not continue to travel from place to place and that she would run away when she had the opportunity. Sometime thereafter, he gave Hernandez a small suitcase and $75.00 to purchase a ticket to Mexico.

Hernandez returned to Mexico late that summer. Ahumada–Aguilar was born on December 22, 1971 in Guadalajara, Mexico. In late 1972 or 1973, Hernandez went to the American consulate in Guadalajara to seek help in locating Deutenberg, but did not receive any assistance in her search. Hernandez entered the United States in 1976 accompanied by Ahumada–Aguilar. She continued in her attempts to find Ahumada–Aguilar's father by scanning phone

books to see if she could locate Deutenberg. She was unsuccessful.

In 1985, Hernandez married a United States citizen and gained legal residency. She assisted Ahumada–Aguilar in obtaining a permanent resident alien registration card when he was 13 years old, based on her legal immigration status. Hernandez made a further attempt to locate Deutenberg by contacting the FBI. She was advised the FBI could not help her without a court order.

On July 15, 1987, Hernandez applied for public assistance funds. She listed "Frederick Duttenberg" [sic] as Ahumada–Aguilar's father. She also agreed to assist the welfare department in identifying Deutenberg and establishing paternity in order to force him to accept financial responsibility for his son. Hernandez and her son did not locate Deutenberg, but eventually learned he had died on April 17, 1994. They obtained a copy of his death certificate that is in this record, as is a copy of the certificate of his birth in Philadelphia.

On December 6, 1990, Ahumada–Aguilar was convicted in a state court in Tulare County, California of the crime of possession of cocaine, a felony. On October 10, 1991, while he was in custody for a traffic offense in Mount Vernon, Washington, Ahumada–Aguilar was interrogated by Darryl Essing, a United States Border Patrol Agent. Agent Essing prepared and served an order to show cause ("OSC") on Ahumada–Aguilar. The OSC required Ahumada–Aguilar to demonstrate why he should not be deported as the result of his prior conviction for possession of cocaine.

On November 18, 1991, Ahumada–Aguilar appeared at his deportation hearing. He admitted that he had been convicted of possession of cocaine. The immigration judge ordered that he be deported. He was deported two days later. Ahumada–Aguilar returned to the United States without the prior approval of the Attorney General. He was again deported on or about December 9, 1994. Following that date, Ahumada–Aguilar again reentered the United States without the permission of the Attorney General.

On June 7, 1995, Ahumada–Aguilar was indicted on two counts of illegally entering the United States after deportation as a convicted felon in violation of 8 U.S.C. § 1326(a) and (b)(1).[1] Ahumada–Aguilar filed a motion to dismiss the indictment, arguing that he was not subject to deportation because he is a United States citizen pursuant to 8 U.S.C. § 1401(g) and § 1409(a). Ahumada–Aguilar asserted that 8 U.S.C. § 1409(a) denies the equal protection rights of a U.S. citizen father, who faces more hurdles than a mother in passing U.S. citizenship to children.

The district court denied the motion. The district court held that Ahumada–Aguilar's equal protection argument was foreclosed by this court's 1995 decision in *Ablang v. Reno*, 52 F.3d 801 (9th Cir.1995). The prosecutor then moved in limine to bar the defense from presenting evidence to the jury that Ahumada–Aguilar is a U.S. citizen to rebut the Government's evidence that he was an alien when he was deported. The court requested the defense to make an offer of proof regarding whether Ahumada–Aguilar met the evidentiary requirements of § 1409(a).

Based on this offer of proof, which included the mother's affidavit, the district court granted the Government's motion to preclude Ahumada–Aguilar from offering any evidence at trial to support his affirmative defense that he was a U.S. citizen and not an alien. The court found that Deutenberg was a U.S. citizen at the time Ahumada–Aguilar was born and that Deutenberg was Ahumada–Aguilar's biological father. Thus, the court concluded that Ahumada–Aguilar satisfied the requirements of § 1409(a)(1) and (a)(2).

---

1. Section 1326 provides in pertinent part that "any *alien* ... whose deportation was subsequent to a conviction for commission of ... a felony (other than an aggravated felony) ... shall be fined under title 18, imprisoned not more than 10 years, or both." (emphasis added).

The court ruled, however, that the citizenship defense could not be presented because Ahumada–Aguilar could not produce evidence that Deutenberg had agreed in writing to provide financial support for Ahumada–Aguilar until he reached the age of 18, as required by § 1409(a)(3). The court also found that Ahumada–Aguilar had failed to offer any proof to fulfill § 1409(a)(4) that (1) Ahumada–Aguilar had been legitimated under the law of his residence or domicile, (2) his U.S. citizen father had acknowledged paternity in writing under oath, or (3) a competent court had ruled that Deutenberg was Ahumada–Aguilar's father. After a bench trial based on stipulated facts, the district court found Ahumada–Aguilar guilty on both counts alleged in the indictment.

## DISCUSSION

■ "The applicable law for transmitting citizenship to a child born abroad when one parent is a U.S. citizen is the statute that was in effect at the time of the child's birth." *Runnett v. Shultz,* 901 F.2d 782, 783 (9th Cir.1990). A child born out of wedlock to a U.S. citizen father and an alien mother is subject to 8 U.S.C. § 1409(a). This section provides:

The provisions of paragraphs (c), (d), (e), and (g) of section 1401 of this title, and of paragraph (2) of section 1408 of this title, shall apply as of the date of birth to a person born out of wedlock if—

(1) a blood relationship between the person and the father is established by clear and convincing evidence,

(2) the father had the nationality of the United States at the time of the person's birth,

(3) the father (unless deceased) has agreed in writing to provide financial

support for the person until the person reaches the age of 18 years, and

(4) while the person is under the age of 18 years—

(A) the person is legitimated under the law of the person's residence or domicile,

(B) the father acknowledges paternity of the person in writing under oath, or

(C) the paternity of the person is established by adjudication of a competent court.

8 U.S.C. § 1409(a).[2] When a child is born abroad to a U.S. citizen mother, however, § 1409(c) applies and citizenship is conferred to the child so long as the mother has had at least one year of continuous residence in the United States. *See* 8 U.S.C. § 1409(c). Ahumada–Aguilar argues on appeal, as he did in the district court, that the additional requirements of § 1409(a) for children born out-of-wedlock where the father is a U.S. citizen constitutes a denial of equal protection under the Fifth Amendment for the citizen father.

### A. Ninth Circuit Law Before *Miller v. Albright*

Before the Supreme Court's decision in *Miller,* Ahumada–Aguilar's challenge would have failed under this court's case law, whether he was asserting his own rights or those of his father. When presented with a child's claim that she was denied equal protection, this court held in 1995 that additional proof provisions, like those contained in § 1409(a), are constitutional as applied to illegitimate children seeking citizenship through the citizenship of the parent. *See Ablang v. Reno,* 52 F.3d 801, 804 (9th Cir.1995). In *Ablang,* we considered a statute similar to § 1409

---

**2.** If a person satisfies § 1409(a)'s requirements, then § 1401(g) applies to that person. Section 1401(g) provides in pertinent part: The following shall be nationals and citizens of the United States at birth: a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the

other a citizen of the United States who, prior to birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years . . . .

that placed additional requirements for citizenship on a child born abroad to a U.S. citizen father. Employing a rational basis review, *Ablang* concluded that the government had legitimate reasons for requiring proof of paternity and found that the statute did not violate equal protection principles. Because there was no gender-based distinction among classes of children, as opposed to parents, there was no reason to apply heightened scrutiny. *See id.* Moreover, even though Ablang argued that the statute's distinction between legitimate and illegitimate children required heightened scrutiny, we held that rational basis review applied in the immigration context. *See id.* at 804–05, *citing Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977).

■ Also prior to *Miller v. Albright*, we held in *Wauchope v. United States Department of State*, 985 F.2d 1407 (9th Cir.1993) that it would be inappropriate to apply heightened scrutiny to a parent's equal protection claim as well. Appellants in *Wauchope* challenged a statute that placed additional requirements for citizenship on children born abroad to U.S. citizen mothers. Like Ahumada–Aguilar, but unlike Ablang, Wauchope's mother was deceased and thus unable to assert her own equal protection rights.[3] We held that Wauchope had third-party standing to challenge the statute on the grounds that it discriminated against her mother on the basis of gender. *Id.* at 1411. A statute that discriminates on the basis of gender typically is subjected to heightened scrutiny. *See United States v. Virginia*, 518 U.S. 515, 532–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Nevertheless, we concluded in *Wauchope* that when reviewing an immigration statute, the Supreme Court's decision in *Fiallo* provided the appropriate standard: "a facially legitimate and bona fide reason," or in equal protection terms, rational basis review. *Wauchope*, 985 F.2d at 1413–14.

## B. The Supreme Court's Decision in *Miller v. Albright*

■ Considering Ahumada–Aguilar's challenge in light of the Supreme Court's decision in *Miller*, we now conclude that heightened scrutiny is appropriate and that § 1409(a)(3) and (a)(4) do not withstand it. In *Miller*, a child born out-of-wedlock to a U.S. citizen father and alien mother challenged § 1409(a)(3)'s demand for proof of financial support by the father and § 1409(a)(4)'s requirement that paternity be legitimated before the child reaches the age of 18. Initially, the child's father, Charlie Miller, filed suit to assert his own rights, but his claim was subsequently dismissed by the district court. Thus, the child, Lorelyn Miller, was the only petitioner before the Supreme Court, seeking to assert a violation of her father's rights. The Court upheld the constitutionality of § 1409(a)(4) in a plurality opinion that was one of multiple separate opinions. In the plurality opinion, Justice Stevens and Chief Justice Rehnquist did not clearly decide which standard was appropriate, but they nevertheless concluded that § 1409(a)(4) survived heightened scrutiny. *Miller*, 118 S.Ct. at 1437 n. 11. They also explained that they had no need to reach the question of whether § 1409(a)(3) is unconstitutional. Justices Scalia and Thomas concurred on the basis that the Court had no power to confer citizenship. Three Justices dissented on the ground that the statute violated equal protection. Justice Breyer's dissent, joined by Justices Souter and Ginsburg, explained that Lorelyn Miller had third-party standing to press her father's claim, that heightened scrutiny was required, and that § 1409(a)(3) and (a)(4) do not pass muster. *Id.* at 1456, 1457–58 (Breyer, J., dissenting). Two Justices (Justices O'Connor and Kennedy) concurred in the result of the plurality opinion. According to their concurrence, the statute violated only the equal protection rights of the claimant's

**3.** The *Ablang* court distinguished *Wauchope* on the basis that "Ablang has standing only to proceed on her own behalf, as her father is still alive." *Ablang*, 52 F.3d at 804 n. 4.

parent, but the claimant lacked standing to vindicate those rights while the parent lived. We focus on Justice O'Connor's and Kennedy's concurrence to aid in our disposition of Ahumada–Aguilar's case. They found that Miller did not satisfy the third prong of the three-part test for determining third-party standing established in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991): "The litigant must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.* at 411, 111 S.Ct. 1364.

Justice O'Connor observed that "[w]hile it seems clear that petitioner has a significant stake in challenging the statute and a close relationship with her father, she has not demonstrated a substantial hindrance to her father's ability to assert his own rights." *Miller*, 118 S.Ct. at 1443 (O'Connor, J., concurring). Miller's father was alive and had even initially filed his own suit. Justice O'Connor observed that third-party standing has been permitted only when more " 'daunting' barriers deterred the rightholder," such as when the rightholder is deceased. *Id.* at 1444, *citing Hodel v. Irving*, 481 U.S. 704, 711–12, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987).

Thus it is significant for our case that in the view of two Justices, had Miller's father been deceased, Miller would have demonstrated third-party standing and they would have held § 1409(a) unconstitutional. Justice Breyer in his dissent noted Justice O'Connor's (and Kennedy's) opinion and offered the following observation:

> [L]ike Justice O'Connor, I "do not share," and thus I believe a Court majority does not share, "Justice Stevens' assessment that the provision withstands heightened scrutiny." I also agree with Justice O'Connor that "[i]t is unlikely" that "gender classifications based on stereotypes can survive heightened scrutiny," a view shared by at least five members of this Court.

*Id.* at 1457–58 (Breyer, J., dissenting). Therefore, had the facts in *Miller* been like those in this case, a majority of the Court would have found § 1409(a)(4) unconstitutional by applying heightened scrutiny.

Our decision in *United States v. Viramontes–Alvarado*, 149 F.3d 912 (9th Cir. 1998) is not to the contrary. In that case, the defendant attempted to assert an equal protection claim on behalf of his father, contending that the California law on legitimation treats U.S. fathers differently from U.S. mothers. *Id.* at 916 n. 2. As in *Miller*, Viramontes–Alvarado's father was alive and, in fact, testified on behalf of his son at trial. *Id.* at 915. Accordingly, we noted that Viramontes–Alvarado's claim was rejected by the Supreme Court in *Miller*.

There remains a question as to whether *Miller* also compels the conclusion that § 1409(a)(3) is unconstitutional. The Justices disagreed whether they were required to review only § 1409(a)(4) or both § 1409(a)(3) and (a)(4). *Compare Miller*, 118 S.Ct. at 1436 (Stevens, J.) *with id.* at 1456 (Breyer, J. dissenting). Justice O'Connor did not distinguish between the provisions, but explained that it is "unlikely" that "any gender classifications based on stereotypes can survive heightened scrutiny." *Id.* at 1445–46 (O'Connor, J., concurring).

We see no reason to distinguish between the provisions in this case. Both rely on outdated stereotypes. *See J.E.B. v. Alabama*, 511 U.S. 127, 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (noting that gender-based discrimination is often reflective of outmoded generalizations about gender). Section 1409(a)(3) relies on the generalization that mothers are more likely to have close ties to and care for their children than are fathers. By requiring a U.S. citizen father to agree in writing that he will provide financial support to the child until the child reaches the age of 18, (a)(3) presumes that a father will not care for

and support his child unless required to do so.

■ The evidence in the record sufficiently demonstrates that Ahumada–Aguilar is the child of a U.S. citizen father, satisfying the requirements of § 1409(a)(1) and (a)(2). Therefore, the judgment of conviction is reversed and the case remanded with instructions to vacate the conviction.

REVERSED AND REMANDED.

KLEINFELD, Circuit Judge, dissenting:

I dissent. The Supreme Court decided the same issue in *Miller v. Albright*[1] a year ago. Yet today we follow the dissent. And we do so in the face of both pre-*Miller*[2] and post-*Miller*[3] Ninth Circuit decisions going the other way. The majority develops a novel interpretation of *Miller*. But if it were correct, *Miller* would have gone the other way.

The statute discriminates among illegitimate children according to the sex of the citizen parent. A citizen mother's child gets citizenship nearly automatically, but a citizen father's child must meet additional requirements.[4] It does not matter what sex the child is, just what sex the unmarried citizen parent is.

For many years, lawyers representing children born of such unions, where the father was the non-citizen, have asserted claims that the sex distinction drawn by the statute is unconstitutional under the Equal Protection Clause. The claims were colorable until a solid wall of authority arose rejecting them. We held in *Ablang* *v. Reno*[5] that the sex distinction was not unconstitutional. Then we held in this case, following *Ablang*, that it was not.[6] We withdrew our disposition because the Supreme Court was about to rule on the question. It rejected the constitutional challenge by a child of a citizen father in *Miller v. Albright*.[7] Then we considered the matter, subsequent to *Miller*, in *Viramontes–Alvarado*.[8] We held that under *Miller*, the statute was not unconstitutional. Yet today, we hold that it is. That is a surprising approach to precedent.

In *Miller v. Albright*, the Supreme Court decision, the litigant was in the same position as Ahumada–Aguilar in all relevant respects (the illegitimate child of a citizen father and non-citizen mother). The litigant made the same Equal Protection argument. And in *Miller*, the child lost the case.

Figuring out what *Miller* means is not as complicated as the majority suggests. True, *Miller* is written in the old English appellate style, with most of the justices writing their own reasons for the decision, instead of a majority agreeing on one rationale. But the facts are simple enough: the child was of a non-citizen mother and citizen father who were not married. And it is simple enough to count to six. Six is the number of justices who agreed that the child loses on the citizenship claim based on the Equal Protection Clause.

In *Miller*, the Supreme Court granted certiorari to answer the question:

> Is the distinction in 8 U.S.C. § 1409 between "illegitimate" children of United States citizen mothers and "illegiti-

1. *Miller v. Albright*, 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998).

2. *See Ablang v. Reno*, 52 F.3d 801 (9th Cir. 1995), *cert. denied* 516 U.S. 1043, 116 S.Ct. 701, 133 L.Ed.2d 658 (1996).

3. *See United States v. Viramontes–Alvarado*, 149 F.3d 912 (9th Cir.1998), *cert. denied* — U.S. ——, 119 S.Ct. 434, 142 L.Ed.2d 354 (1998).

4. *See* 8 U.S.C. § 1409.

5. *Ablang*, 52 F.3d 801 (9th Cir.1995).

6. *See United States v. Ahumada–Aguilar*, 124 F.3d 213 (9th Cir.1997), *unpublished disposition, withdrawn.*

7. *Miller*, 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998).

8. *Viramontes–Alvarado*, 149 F.3d 912 (9th Cir. 1998).

mate" citizen fathers a violation of the Fifth Amendment to the United States Constitution? [9]

The Supreme Court's answer was no. We are therefore obligated to give the same answer.

Were the count to six disputable, the dispute would be ended by our own post-*Miller* reading of *Miller*. Addressing the same Equal Protection Clause argument, we held in *Viramontes–Alvarado* [10] that, "this argument has been rejected by the Supreme Court in *Miller v. Albright*." [11] I do not think there is any room whatsoever, regardless of how impressed we may be with the force of the Equal Protection claim, for us to accept it. We are bound by precedent of our court, the Supreme Court, and our court construing the Supreme Court decision, to reject it.

In *Miller*, Justice Stevens, joined by Chief Justice Rehnquist, said the distinction drawn by the statute between citizen fathers and citizen mothers was neither arbitrary nor invidious, and did not violate the Equal Protection Clause. Justice O'Connor, joined by Justice Kennedy, concurred in the judgment, on the ground that because the sex difference was in treatment of fathers and mothers, not male and female children, the child did not have standing to raise the father's Equal Protection claim. Justice Scalia, joined by Justice Thomas, concurring in the judgment, said that the Court could not reach the Equal Protection issue, because it lacked power to grant citizenship to an alien in any event, and could do nothing but strike the whole law and deny relief if it found the distinction to be unconstitutional. Justices Ginsburg, Souter and Breyer dissented. That amounts to six justices agreeing that the child raising the challenge must lose. It leaves no room for us to hold, as the majority does today, that the child wins.

The majority's theory today is that because Ahumada–Aguilar's father is dead, Ahumada–Aguilar has standing to assert his father's claim that he is being discriminated against because of his sex. Even if that distinction made a difference it would be weak in this case. When Ahumada–Aguilar's deportation hearing was held, his father was still alive. So even the thread today's majority tugs, that Justice O'Connor said in *Miller* that the child "has not demonstrated a substantial hindrance to her father's ability to assert his own rights," [12] does not distinguish the cases. And it is only a thread. The Supreme Court has not held that if the parent is dead, then the child can assert the parent's right not to be discriminated against on account of sex.

I doubt that there can be standing for purposes of Article III where a child purports to litigate the father's sex discrimination claim, in the absence of unusual circumstances showing that the father did all he could to assert it for himself. The father's interest may be adverse to the child's, so the child is asserting only his own interest and not his father's. Four justices in the majority thought the child had to lose whether she had standing or not. Justice O'Connor and Justice Kennedy, the only two justices in the majority even to reach standing, concluded that the child did not have standing. Because the distinction by sex was drawn by Congress between the parents, not between male and female children, the children cannot establish a case or controversy, and a court lacks jurisdiction under Article III, section 1 of the Constitution, to hold in the child's case that the statute discriminated unconstitutionally against one of the parents by sex.

The law established by *Miller* is that a child of an alien mother and citizen father is not entitled to constitutional relief from

---

9.  *Miller*, 118 S.Ct. at 1434 (internal quotations omitted).

10.  *Viramontes–Alvarado*, 149 F.3d 912 (9th Cir.1998).

11.  *Id.* at 916, n. 2.

12.  *Miller*, 118 S.Ct. at 1443.

the statutory requirements on account of the sex difference in the way the statute treats such a child as compared with the child of an alien father and citizen mother. Whether because the sex distinction is not arbitrary or invidious, as two justices think, or because the child lacks standing to challenge any invidiousness or arbitrariness, as two other justices think, or because such a child could not obtain a judicial remedy even if the child had standing and the statute denied Equal Protection, as two other justices think, the consequence is the same: the Supreme Court has held that the child obtains no remedy. So must we, under the one Supreme Court clause.[13]

*Wauchope*,[14] even if it had any force sufficient to overcome a Supreme Court decision and a subsequent Ninth Circuit decision interpreting the Supreme Court decision (of course it does not, and must be treated as overruled to the extent that it may be inconsistent with *Miller*), would be distinguishable. It says that children can assert their dead mothers' constitutional claims where "their interests coincide with those of their mothers and are equally as intense." [15]  How do we know that Ahumada–Aguilar's father had the same interest as Ahumada–Aguilar, held with equal intensity, that Ahumada–Aguilar should be a United States citizen?  The only fact in the record bearing on the father's interest was that he sent the mother packing.  His financial interest was better served by not supporting his son than by supporting him. There is no particular reason to think that, were the father alive now (he was when Ahumada–Aguilar's deportation hearing was held, and did nothing about it) he would say, "I intensely want my long lost son to be a United States citizen."

The majority holds that the statute Congress passed is unconstitutional because it falls into the class of laws that "rely on outdated stereotypes." According to the majority, the statute "relies on the gener-

alization that mothers are more likely to have close ties to and care for their children than are fathers." Though the same zeitgeist floats in my air as in the majority's, I cannot find the "stereotypes" clause in my copy of the Constitution. Probably some members of Congress had the thoughts today's majority attributes to them, but they still had constitutional authority to make laws. Probably some thought that it is a lot easier to be sure of maternity than paternity. Though the uncertainty can now be eliminated by DNA tests, the expense and infrequency of testing still provides a rational basis for a distinction. And probably some did not much care about the stereotype the majority attributes to them. This statute was passed during the Korean War. Members of Congress knew that American soldiers who went abroad to fight wars, and caused children to be conceived while they were abroad, were overwhelmingly male, because only males were drafted, so that the number of children born illegitimately of male citizens might be large enough to affect immigration policy, while the number of illegitimate children of female citizens would be negligible. They may also have sought to minimize the administrative burden on the Department of Defense for paternity and citizenship claims respectively by the women the soldiers left behind and their children. This may not be pretty, but it is a rational basis for the sex distinction. Congress had plenary power over immigration empowering it to make such distinctions.

There is no particular barrier to the father's Equal Protection claim being raised, if some father wants to raise it. Some noncustodial fathers of children born out of wedlock do not care to pay child support if it can be avoided. A father might want his illegitimate child to have United States citizenship, yet not want to pay child support as required by the stat-

---

**13.**  U.S. Const. Art. III, § 1.

**14.**  *Wauchope v. United States Dept. of State,* 985 F.2d 1407 (9th Cir.1993).

**15.**  *Wauchope,* 985 F.2d at 1411.

ute at issue. Such a father could challenge the statute. We lack the power under the Constitution to reach out to hold an act of Congress unconstitutional when the person challenging it is not in the class of persons against whom the arguably unconstitutional distinction is made.

As two justices said in *Miller,* Congress had a rational purpose for the law. And as two more said, it would not matter if they did not have a rational purpose, because courts cannot confer citizenship, whether the statute not conferring it is constitutional or not. And as two more said, it would not matter if Congress lacked a rational purpose and courts could confer citizenship, because the child lacks standing to assert that the father was discriminated against by sex. And as we held in *Viramontes–Alvarado,* the Supreme Court has held in *Miller* that the child loses this claim.