# United States Court of Appeals
## For the First Circuit

No. 99-1852

LUIS AQUILES HERRERA-INIRIO,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF

THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Chief Judge,

Coffin, Senior Circuit Judge,

and Selya, Circuit Judge.

Peter J. Zatz-Hanley, with whom Ramon M. Gonzalez was on brief, for petitioner.
Terri J. Scadron, Senior Litigation Counsel, Office of Immigration Litigation, United States Department of Justice, with whom David W. Ogden, Acting Assistant Attorney General, Civil Division, and Lyle D. Jentzer, Trial Attorney, Office of Immigration Litigation, were on brief, for respondent.

April 5, 2000

**SELYA, Circuit Judge.** In this case, the petitioner, Luis Aquiles Herrera-Inirio, hoists the red flag of federalism and seeks to overturn an order calling for his deportation entered by the Board of Immigration Appeals (the Board). The Board's removal order rests upon its interpretation of 8 U.S.C. § 1101(a)(48)(A), the provision in the Immigration and Nationality Act (the I&N Act) that defines the term "conviction" for immigration-related purposes. The petitioner charges that the Board misread the law, failed to give full faith and credit to the Puerto Rico courts' construction of a Puerto Rico domestic violence statute, overstepped the bounds set by the Tenth Amendment, and transgressed the Due Process Clause of the Fifth Amendment. Finding that the petitioner's arguments lack force, we deny the petition for review.

## I. BACKGROUND

The petitioner is a Dominican national who was admitted to the United States as an immigrant in 1994. He made his home in Puerto Rico, married an American citizen, and became a lawful permanent resident on April 16, 1997. Approximately two months later, his wife filed a complaint with the police, in which she claimed that the petitioner had used physical and psychological violence against her (e.g., striking her in the face with his fist, biting her breast, and forcing her into a car against her

will).  The police charged the petitioner with the criminal offense of aggravated abuse.  See P.R. Laws Ann. tit. 8, § 632.  On December 4, 1997, he pled guilty to a lesser charge of simple abuse.  See id. § 631.

On January 30, 1998, the Puerto Rico Superior Court issued a resolution which commemorated that the petitioner had been "found guilty" on December 4 of a crime involving spousal abuse, but suspended further proceedings and ordered the petitioner to comply with a series of conditions for one year.  See id. § 636 (stating in pertinent part that after an accused pleads guilty to certain specified crimes, "the court may . . . suspend all procedures and submit the convicted person to probation, provided he/she participates in a reeducation and retraining program for persons who incur abusive conduct in a relationship with another").  The resolution also stated:

> If during this trial period the defendant does not violate any of the conditions, the Court will, at its sole discretion . . . be able to exonerate the defendant and dismiss the case against him. . . .  The exonerated person will have the right to, once the case has been dismissed, have the Puerto Rico Police Superintendent return any records of fingerprints or photographies [sic] in their possession, taken in relation to the violation which gave origin to this accusation.

A federal statute, 8 U.S.C. § 1227(a)(2)(E)(i), provides that an alien who is convicted of a crime of domestic

-4-

violence at any time after his entry into the United States is subject to deportation. A companion statute, 8 U.S.C. § 1227(a)(2)(A)(i), provides that an alien who, having acquired lawful permanent resident status, is convicted within ten years after admission to the United States of a crime of moral turpitude (for which a sentence of one year or longer may be imposed) is likewise subject to deportation. On July 24, 1998, the Immigration and Naturalization Service (the INS) invoked these statutes and instituted removal proceedings against the petitioner.

At his deportation hearing, the petitioner argued that he had merely been placed in a pretrial diversion program and thus had neither been "convicted" of the offense of spousal abuse nor "sentenced" to one year of probation. On January 15, 1999, the immigration judge (the IJ) ruled that the petitioner had been convicted of the crime for immigration purposes; that the crime was potentially punishable by a prison term of one year and involved moral turpitude; and that the petitioner had been sentenced to probation. Consequently, she ordered the petitioner removed from the United States.

The petitioner appealed this order to the Board. See 8 C.F.R. §§ 3.1(b)(3), 240.15 (1999). Shortly thereafter, the one-year probationary period expired. Accordingly, on February

-5-

12, 1999, the Superior Court dismissed the indictment in accordance with its earlier resolution and directed the police superintendent to purge the records. The petitioner then asked the Board to terminate the removal proceedings or, in the alternative, to remand the case to the IJ for action "according with the dismissal of the criminal charges." The Board demurred, instead dismissing the petitioner's appeal. In its decision, the Board held that the petitioner had been convicted for immigration purposes pursuant to 8 U.S.C. § 1101(a)(48)(A) because he had entered a guilty plea and a judge had decreed a form of punishment (the one-year probationary period). The Board also agreed with the IJ's determination that the petitioner had been convicted of a crime involving both spousal abuse and moral turpitude.

This timely petition for judicial review followed. In it, the petitioner challenges the finding that what transpired amounted to a "conviction" for immigration purposes (and, concomitantly, the constitutionality of section 1101(a)(48)(A)). He does not seek review of the Board's determination that the subject offense was a crime that involved both domestic violence and moral turpitude, and we therefore eschew any further reference to that aspect of the matter.

## II. ANALYSIS

-6-

We bifurcate our analysis, first considering the propriety of the Board's construction of section 1101(a)(48)(A), and then addressing the petitioner's constitutional challenges.

## A. Was Petitioner "Convicted"?

We review de novo an agency's construction of a statute that it administers, subject, however, to established principles of deference. See INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25 (1999); Strickland v. Commissioner, Me. Dep't of Human Servs., 96 F.3d 542, 545 (1st Cir. 1996). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984). If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. Because agency officials acting in the immigration context "exercise especially sensitive political functions that implicate questions of foreign relations," INS v. Abudu, 485 U.S. 94, 110 (1988), deference to administrative expertise is particularly appropriate.

The statute sub judice provides that:

The term "conviction" means, with respect to an alien, a formal judgment of guilt of the

-7-

alien entered by a court or, if adjudication of guilt has been withheld, where—
(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt; and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

8 U.S.C. § 1101(a)(48)(A). This language leaves nothing to the imagination. The text unambiguously encompasses within the definition of "conviction" situations in which adjudications of guilt have been withheld, as long as the defendant's guilt has been established by a trial, plea, or admission, and a judicial officer orders some form of punishment, penalty, or restraint on the defendant's liberty.

The petitioner does not contest — nor could he — that he pled guilty or that the conditions imposed upon him during the one-year probationary period constituted a form of punishment, penalty, or restraint. Instead, he posits that his particular situation eludes the statute's sweep because the local court eventually issued a formal judgment of exoneration that wiped the slate clean.[1] This means, he says, that there was

_____

[1]For purposes of this case, we treat Puerto Rico as the functional equivalent of a state, according the same effect to its judicial decrees as we would to the orders of a state court and according the same effect to its legislative enactments as we would to state statutes. See 28 U.S.C. § 1738 (extending full faith and credit doctrine to Puerto Rico); 48 U.S.C. § 734 (providing that, unless otherwise specified, federal statutes

-8-

neither a "withheld adjudication of guilt" nor a "formal judgment of guilt" in his case.

This construct is unsound.  Passing the fact that at the time of the IJ's determination the Puerto Rico Superior Court had not yet dismissed the indictment (and, thus, an adjudication of the petitioner's guilt was indeed "withheld"), no provision in the I&N Act gives controlling effect to state law or requires the INS to do an about-face if a state, pursuant to a diversionary disposition scheme, retroactively erases a conviction.  To the exact contrary, state rehabilitative programs that have the effect of vacating a conviction other than on the merits or on a basis tied to the violation of a statutory or constitutional right in the underlying criminal case have no bearing in determining whether an alien is to be considered "convicted"  under section 1101(a)(48)(A).  See United States v. Campbell, 167 F.3d 94, 98 (2d Cir. 1999); In re Roldan-Santoyo, Int. Dec. 3377, at 19 (BIA 1999); see also Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 119 (1983); United States v. Cuevas, 75 F.3d 778, 782 (1st Cir. 1996).

If more were needed — and we do not think it is — the legislative history makes it crystal clear that the definition

---

applicable to states apply to Puerto Rico); see also Cruz v. Melecio, 204 F.3d 14, __ (1st Cir. 2000) [slip op. at 5-6].

-9-

of "conviction" limned in section 1101(a)(48)(A) applies to the petitioner's situation. Frustrated by the crazy quilt of anomalous results that flowed from widely disparate state rehabilitative and diversionary arrangements, the Board attempted over a decade ago to ensure uniformity by adopting a multi-part definition of "conviction." See In re Ozkok, 19 I. & N. Dec. 546, 551-52 (BIA 1988). This paradigm obligated the INS to show that the alien had entered a guilty plea (or otherwise been found guilty); that the judge had ordered some form of punishment, penalty, or restraint on the alien's liberty; and that, if not entered contemporaneously with the order for punishment, a judgment or adjudication of guilt could be entered (without the need for any further proceedings regarding the alien's guilt or innocence on the original charge) if the alien violated the terms or conditions of the court's order. See id.

This effort failed to produce the desired uniformity and Congress stepped in to fill the void. It enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546, which, among other things, added section 1101(a)(48) (and its uniform definition of "conviction") to the I&N Act. The

-10-

Conference Committee Report that accompanied the IIRIRA dwelt at length on Congress's intent in enacting section 1101(a)(48)(A):

> This section deliberately broadens the scope of the definition of "conviction" beyond that adopted by the Board of Immigration Appeals in Matter of Ozkok . . . . As the Board noted in Ozkok, there exist[s] in the various States a myriad of provisions for ameliorating the effects of a conviction. As a result, aliens who have clearly been guilty of criminal behavior and whom Congress intended to be considered "convicted" have escaped the immigration consequences normally attendant upon a conviction. Ozkok, while making it more difficult for alien criminals to escape such consequences, does not go far enough to address situations where a judgment of guilt or imposition of sentence is suspended, conditioned upon the alien's future good behavior. For example, the third prong of Ozkok requires that a judgment or adjudication of guilt may be entered if the alien violates a term or condition of probation, without the need for any further proceedings regarding guilt or innocence on the original charge. In some States, adjudication may be "deferred" upon a finding or confession of guilt, and a final judgment of guilt may not be imposed if the alien violates probation until there is an additional proceeding regarding the alien's guilt or innocence. In such cases, the third prong of the Ozkok definition prevents the original finding or confession of guilt to be considered a "conviction" for deportation purposes. This new provision, by removing the third prong of Ozkok, clarifies Congressional intent that even in cases where adjudication is "deferred," the original finding or confession of guilt is sufficient to establish a "conviction" for purposes of the immigration laws.

H.R. Conf. Rep. No. 104-828, at 224 (1996), quoted in Moosa v. INS, 171 F.3d 994, 1002 (5th Cir. 1999) (alterations omitted). The emphasis that Congress placed on the original admission of guilt plainly indicates that a subsequent dismissal of charges, based solely on rehabilitative goals and not on the merits of the charge or on a defect in the underlying criminal proceedings, does not vitiate that original admission. See Moosa, 171 F.3d at 1009 (observing that Congress deliberately included deferred adjudications within the definition of "conviction" for purposes of section 1101(a)(48)(A)).

To say more on this topic would be supererogatory. The nature of the petitioner's offense, his guilty plea, and the Superior Court's imposition of a one-year term of probation combine to bring his case squarely within the ambit of the statutory definition of "conviction" now contained in the I&N Act, notwithstanding the Superior Court's subsequent dismissal of the indictment. See id. at 1010; In re Punu, Int. Dec. 3364 (BIA 1998). Consequently, the Board did not misconstrue the Act when it concluded that the petitioner had been "convicted" for immigration purposes.

**B.  Is Section 1101(a)(48)(A) Constitutional?**

An alien who has become a lawful permanent resident enjoys the full protection of the United States Constitution.

See Kwong Hai Chew v. Colding, 344 U.S. 590, 596 n.5 (1953); Campos v. INS, 961 F.2d 309, 316 (1st Cir. 1992); see also Landon v. Plasencia, 459 U.S. 21, 32 (1982) (explaining that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly"). Taking due advantage of this protection, the petitioner launches a volley of challenges to the constitutionality of section 1101(a)(48)(A). We examine them seriatim.

1. **Full Faith and Credit.** In enacting section 1101(a)(48)(A), Congress defined the term "conviction" for purposes of federal immigration law. That definition applies even if both the predicate offense and the penalty therefor are creatures of state law. See White v. INS, 17 F.3d 475, 479 (1st Cir. 1994). The petitioner claims that this hybridization risks distorting the meaning of local law. He sees this case as a paradigmatic example of a situation in which that risk has come home to roost, frustrating the purpose of Puerto Rico's chosen scheme for diversionary dispositions and denying Puerto Rico (and the petitioner) the benefit of full faith and credit. We do not agree.

Congress long ago passed a statute implementing the Full Faith and Credit Clause, U.S. Const. art. IV, § 1. See 28

-13-

U.S.C. § 1738 (providing, inter alia, that the "Acts, records and judicial proceedings" of each of the states, territories, and possessions "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of [the originating] State, Territory or Possession").  Under this regime, "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."  Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984). The "[a]cts, records and judicial proceedings" of Puerto Rico's courts fall within this prescription.

Neither the Full Faith and Credit Clause nor the statutory overlay

> purports to prevent federal legislative authorities from writing federal statutes that differ from state statutes or from attaching, to words in a federal statute, a meaning that differs from the meaning attached to the same word when used in a statute enacted by a state.  A federal Union in which this were not so — a Union in which states possessed the constitutional power to control federal courts' interpretation of federal statutes — would not resemble our post-Civil War United States.

Molina v. INS, 981 F.2d 14, 19 (1st Cir. 1992) (Breyer, J.); cf. Cuevas, 75 F.3d at 782 (noting that the immigration laws contain no indication that they are to be interpreted in accordance with

-14-

state law).  On the basis of this reasoning — which we deem sound — section 1101(a)(48)(A) does not infract applicable principles of full faith and credit.  See Yanez-Popp v. INS, 998 F.2d 231, 237 (4th Cir. 1993).

**2.  The Tenth Amendment.**  The petitioner contends that Congress, in enacting section 1101(a)(48)(A), offended the Tenth Amendment because it disregarded Puerto Rico's public policy anent the handling of domestic violence cases.  This contention is devoid of merit.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  This language "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States."  New York v. United States, 505 U.S. 144, 157 (1992).  Thus, for example, Congress may not command states to administer federal regulatory programs, conscript state officers directly, or otherwise treat state governments as federal handmaidens.  See New York v. United States, 179 F.3d 29, 33-34 (2d Cir. 1999), cert. denied, 120 S. Ct. 932 (2000).

This limitation on federal authority is inapposite here.  As the Supreme Court declared almost a half-century ago,

-15-

the proposition "that the formulation of . . . policies [pertaining to the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government." Galvan v. Press, 347 U.S. 522, 531 (1954). Since then, the Court repeatedly has reiterated that Congress's legislative power in enacting immigration-related laws is at least as pervasive and encompassing as in any conceivable field. See, e.g., Reno v. Flores, 507 U.S. 292, 305 (1993); Fiallo v. Bell, 430 U.S. 787, 792 (1977); see also Amanullah v. Nelson, 811 F.2d 1, 4 (1st Cir. 1987) (collecting cases). In short, immigration is uniquely a matter of federal, not local, concern. See U.S. Const. art. I, § 9, cl. 1.

This gets the grease from the goose. Because Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters. See New York, 179 F.3d at 34-35; Lopez v. INS, 758 F.2d 1390, 1392 (10th Cir. 1985). After all, in areas in which plenary federal power exists, "the Supremacy Clause permits no other result," notwithstanding that Congress may enact laws that "curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider

-16-

important."  <u>Hodel</u> v. <u>Virginia Surface Mining & Reclam. Ass'n</u>, 452 U.S. 264, 290 (1981).  So it is here.

3.  **Substantive Due Process**.  We turn now to the final item in the petitioner's asseverational array:  his claim that both section 1101(a)(48)(A) and the specific action taken against him violate his right to substantive due process.  In connection with this claim, he says that section 1101(a)(48)(A) unconstitutionally forecloses the application and enforcement of a valid and final state court judgment, and that the INS's removal order, in light of the Superior Court's dismissal of the indictment, works a comparable deprivation.

### a.  The Legislation

Because Congress has plenary power to make policies and rules concerning the exclusion of aliens, <u>see</u> U.S. Const. art. I, § 8, cl. 4; <u>see</u> <u>also</u> <u>Plyler</u> v. <u>Doe</u>, 457 U.S. 202, 225 (1992), the immigration process is, in the last analysis, frankly political in character.  The courts' authority to scrutinize legislation in this field is correspondingly narrow.  <u>See</u> <u>Fiallo</u>, 430 U.S. at 792; <u>Hampton</u> v. <u>Mow Sun Wong</u>, 426 U.S. 88, 101 n.21 (1976).  As a result, the principal indicium of whether immigration legislation offends substantive due process is whether the law is based upon a "facially legitimate and bona fide reason." <u>Fiallo</u>, 430 U.S. at 794-95; <u>accord</u> <u>Kleindienst</u> v.

Mandel, 408 U.S. 753, 770 (1972).  If so, "courts will neither look behind the exercise of discretion, nor test it by balancing its justification against the constitutional interest asserted by those challenging the statute."  Campos, 961 F.2d at 316.

Viewed against this jurisprudential backdrop, section 1101(a)(48)(A) easily passes constitutional muster.  As previously discussed, see supra Part II(A), the statute grew out of a perceived need for a nationally uniform definition of the term "conviction" for immigration purposes.  Indeed, Congress enacted section 1101(a)(48)(A) for the express purpose of counteracting (and, thus, correcting) disparities caused by varying state rehabilitative procedures.  See Moosa, 171 F.3d at 1001-02 (synthesizing legislative history).  By any standard, this is a plausible basis for federal legislative intervention and, thus, a "facially legitimate and bona fide reason" for congressional action.

As a fallback, the petitioner asserts that section 1101(a)(48)(A) fails the due process test because there is a fundamental "right" to have a state law definition of "conviction" applied in removal proceedings.  This is wishful thinking.  There is simply no purchase in the Supreme Court's precedents for elevating so narrowly focused a "right" to the status of one of "those fundamental rights and liberties which

-18-

are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (citations and internal quotation marks omitted). Indeed, we agree with the Fourth Circuit that when, as now, "narrow compass and special circumstances" attend a claimed right, the odds are very great that the right is not fundamental.  Hawkins v. Freeman, 195 F.3d 732, 747 (4th Cir. 1999) (en banc).  Here, moreover, two other factors — the Court's announced reluctance to expand the boundaries of substantive due process, see Glucksberg, 521 U.S. at 720; Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 183 (1st Cir. 1997), and the plenary power that Congress enjoys over the field of immigration — make the proposition unarguable.  We conclude, therefore, that the liberty interest asserted by the petitioner does not implicate a fundamental right.

That determination undercuts the petitioner's argument. Because the right asserted is not a fundamental one, section 1101(a)(48)(A) need only be rationally related to a legitimate governmental interest in order to survive judicial perscrutation.  See Flores, 507 U.S. at 306.  This is pretty much the same as saying that there must have been a "facially

legitimate and bona fide reason" underlying the enactment of the statute.  See United States v. Ahumada-Aguilar, 189 F.3d 1121, 1125 (9th Cir. 1999); Turkhan v. Perryman, 188 F.3d 814, 828-29 (7th Cir. 1999); Azizi v. Thornburgh, 908 F.2d 1130, 1133 n.2 (2d Cir. 1990); see also Collin O'Connor Udell, Miller v. Albright:  Plenary Power, Equal Protection, and the Rights of an Alien Love Child, 12 Geo. Immigr. L.J. 621, 628 & n.67, 652 (1998) (noting that "the [facially legitimate bona fide reason] test has been cast as the equivalent of rational basis scrutiny by some courts"); Stephen H. Legomsky, Ten More Years of Plenary Power, 22 Hastings Const. L.Q. 925, 931 (1995) (similar).  As discussed above, a sufficient reason — the government's need for a nationally uniform definition of the term "conviction" for immigration purposes — exists here.  Section 1101(a)(48)(A) rationally advances that goal.

### b.  The Executive Action

The second branch of the petitioner's substantive due process thesis is no more persuasive.  In it, he assails the actions taken by the INS in this case.  But those actions were precisely aligned with the purpose of the statute and well within its fair intendment.  Executive actions that do no more than comport with valid statutory commands simply are not the

stuff from which substantive due process violations can be fashioned.  See Kleindienst, 408 U.S. at 770.

Of course, the same result would obtain even if, contrary to precedent, we yielded to the petitioner's importuning and analyzed the situation under the type of substantive due process analysis that characteristically attaches to executive action outside the immigration context. The removal order in this case, while strong medicine, in no way sinks to the level of "outrageous, uncivilized, and intolerable" conduct, Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999), nor does it "shock the conscience," Evans v. Avery, 100 F.3d 1033, 1038 (1st Cir. 1996).

## III.  CONCLUSION

We need go no further.  For the reasons stated, we conclude that the Board correctly determined that the petitioner was convicted for immigration purposes, and that section 1101(a)(48)(a) — which compelled that determination — does not violate the Constitution.  Consequently, the removal order was lawful.

**The order of the Board of Immigration Appeals is affirmed, and the petition for review is denied and dismissed.**