# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

---

m 01-60364

---

RICARDO RENTERIA-GONZALEZ,

Petitioner,

VERSUS

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

---

Petition for Review of an Order of
the Board of Immigration Appeals

---

November 11, 2002

Before SMITH and BENAVIDES, Circuit
Judges, and FITZWATER,[*] District Judge.

JERRY E. SMITH, Circuit Judge:

The Immigration and Naturalization Service
("INS") and Ricardo Renteria-Gonzalez have

wrangled for over a decade. Now that they
finally have reached this court, their case
provides yet another opportunity to interpret
the Illegal Immigration Reform and Immigrant
Responsibility Act of 1996 ("IIRIRA"), Pub.
L. No. 104-208, 110 Stat. 3009-546 (1996).[1]

---

[*] District Judge of the Northern District of
Texas, sitting by designation.

---

[1] We cite this statute using the abbreviation
"IIRIRA" followed by the section number from the
(continued...)

In particular, the case presents a complicated interpretive question involving the definition, criminal alien removal, and jurisdictional sections of IIRIRA.

Although Renteria-Gonzalez has an "aggravated felony" conviction under the IIRIRA definition, his conviction did not qualify as an "aggravated felony" under pre-IIRIRA immigration law. IIRIRA therefore does not deprive this court of jurisdiction over the petition for review. Exercising that jurisdiction, we deny the petition for review under the substantial evidence standard.

## I.

Renteria-Gonzalez, a citizen of Mexico, obtained temporary resident status in the United States in 1987. In 1989, he pleaded guilty of transporting illegal aliens within the United States in violation of 8 U.S.C. § 1324(a)(1) and 18 U.S.C. § 2. The district court sentenced him to six months' confinement and three years' supervised release. The court also issued a "judicial recommendation against deportation" ("JRAD") under 8 U.S.C. § 1251-(b) (1988) (repealed by the Immigration Act of 1990, Pub. L. No. 101-649, § 505, 104 Stat. 4978, 5050 (1990)).[2]

Notwithstanding the JRAD, the INS began deportation proceedings in August 1990 by issuing an order to show cause based on Renteria-Gonzalez's unlawful entry into the United

---

(...continued)
statute.

[2] Although styled a "recommendation," a JRAD was "binding on the Attorney General." *United States v. Castro*, 26 F.3d 557, 560 (5th Cir. 1994) (citing *Janvier v. United States*, 793 F.2d 449, 452 (2d Cir. 1986)).

States on the occasion when he transported the illegal aliens. The INS presumably used this allegation to avoid the JRAD on the transporting conviction. Yet, the INS had not terminated Renteria-Gonzalez's temporary resident status either when he entered the United States with the illegal aliens or when the agency issued the order to show cause.

Thus, the INS voluntarily dismissed the order to show cause in August 1991. But in September 1991, the agency sent Renteria-Gonzalez a notice of intent to terminate his temporary resident status, then terminated his status in November 1991.

Renteria-Gonzalez sought two avenues of relief from the attempts to deport him. First, he appealed the termination of his temporary resident status to the INS's Legalization Appeals Unit ("LAU"), which affirmed the termination of his temporary resident status in July 1992. Second, he petitioned the district court to vacate his conviction.

In February 1992, a magistrate judge recommended that the district court vacate Renteria-Gonzalez's conviction under the All Writs Act, 28 U.S.C. § 1651. The district court adopted the recommendation and vacated his conviction in October 1992 (the "Order to Vacate"). The government immediately moved the court to reconsider the Order to Vacate, but the court denied the motion. The government did not appeal the Order to Vacate.

The INS began deportation proceedings anew in January 1994 by issuing another order to show cause, this time basing the order not only on Renteria-Gonzalez's alleged unlawful entry and presence, but also on his alien

smuggling activities.[3] The immigration judge ("IJ") held extensive hearings on the order at which Renteria-Gonzalez, INS Border Patrol Agent Lane Horger, and Antonio Bautista-Garcia, Renteria-Gonzalez's accomplice, testified.

The IJ's decision ultimately turned on one factual dispute: Horger testified that the illegal aliens had told him that Renteria-Gonzalez and Bautista-Garcia had picked them up in Mexico for $150 to $250 per alien, whereas Renteria-Gonzalez and Bautista-Garcia testified that they picked up the illegal aliens at a rest stop in the United States without knowledge of their alien status. Based on internal inconsistencies in the testimony of Renteria-Gonzalez and Bautista-Garcia and other circumstantial evidence, the IJ credited Horger's testimony and held that Renteria-Gonzalez was deportable.

Renteria-Gonzalez timely appealed to the Board of Immigration Appeals ("BIA"), arguing that he had not received a fair hearing because the INS had made no effort to obtain the presence of the illegal aliens he transported, and the IJ had not let him test Horger's knowledge of Spanish on cross-examination. Renteria-Gonzalez also argued that the IJ and BIA lacked jurisdiction because the INS had not properly terminated his temporary resident status before instituting deportation proceedings. After an inexplicable delay of nearly seven years, the BIA in April 2001 finally dismissed Renteria-Gonzalez's appeal and approved a final order of removal.

Renteria-Gonzalez petitions for review of the BIA's decision.

II.

IIRIRA is a difficult statute. It consumes over a quarter of a 750-page omnibus law. It amends the Immigration and Nationality Act ("INA") in dozens of important but technical ways. Most importantly for this case, IIRIRA dramatically restricts judicial review of final orders of removal.

Because IIRIRA is complicated, and its jurisdictional sections especially so, we first examine the relevant sections and the INS's seemingly well-crafted argument against jurisdiction. We then explain why Renteria-Gonzalez's conviction of transporting illegal aliens within the United States was not an "aggravated felony" conviction under pre-IIRIRA immigration law that, in the case of an "aggravated felony," would strip this court of jurisdiction to review a petition for review.

A.

IIRIRA has a transitional rule and a permanent rule for judicial review of a final order of removal. The transitional rule appears only in IIRIRA § 309(c)(4)(G), not in the United States Code. The permanent rule appears as 8 U.S.C. § 1252(a)(2)(C). The transitional and permanent rules are nearly identical. The transitional rule states that

> there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in section 212(a)(2) or section 241(a)(2)(A)(iii), (B), (C), or (D) of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act), or any offense covered by

---

[3] Under pre-IIRIRA law, these two grounds for deportation appeared at 8 U.S.C. § 1251(a)(1)(B), (E)(i) (1994). IIRIRA re-codified these grounds for deportation at 8 U.S.C. § 1227(a)(1)(B), (E)(i). *See* IIRIRA § 305(a)(2).

section 241(a)(2)(A)(ii) of such Act (as in effect on such date) for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 241(a)(2)(A)(i) of such Act (as so in effect).

IIRIRA § 309(c)(4)(G).

Aside from syntactical differences, the permanent rule is identical, except that it omits the three parentheticals. *See* 8 U.S.C. § 1252-(a)(2)(C). As we explain, *infra* part II.B.2, these parentheticals make all the difference in this case.

The transitional rule governs Renteria-Gonzalez's case. It applies to any alien "whose deportation proceedings commence before IIRIRA's general effective date of April 1, 1997, and conclude more than thirty days after its passage on September 30, 1996." *Lerma de Garcia v. INS*, 141 F.3d 215, 216 (5th Cir. 1998); IIRIRA § 309(c)(1), (4). Renteria-Gonzalez's proceedings began in January 1994 and concluded in April 2001.

The transitional rule (like the permanent rule) withdraws jurisdiction from the federal courts to review a final order of removal against an alien who is removable by reason of having committed one of several criminal offenses, one of which is an "aggravated felony." 8 U.S.C. § 1227(a)(2)(A)(iii) (cross referenced in IIRIRA § 309(c)(4)(G)). The INA now defines (but once did not) the term "aggravated felony," and in great detail. 8 U.S.C. § 1101(a)(43). Among the crimes included is transporting an illegal alien in violation of § 1324(a)(1)(A) or (2), the crime of which Renteria-Gonzalez pleaded guilty. 8 U.S.C. § 1101(a)(43)(N); *Ruiz-Romero v. Reno*, 205 F.3d 837 (5th Cir. 2000).

Furthermore, the transitional rule (again, like the permanent rule) applies to a petition for review, even if the basis for the final order of removal is not the jurisdiction-stripping criminal offense. The transitional rule applies to aliens "deportable by reason of having committed" an aggravated felony. This language does not require that the alien in fact *be deported* for having committed an aggravated felony, but only that he *could be deported*, i.e., *is deportable*, by reason of having committed an aggravated felony. "What the INS originally charged is of no consequence; so long as the alien in fact is removable for committing an aggravated felony, this court has no jurisdiction, irrespective of whether the INS originally sought removal for that reason." *Lopez-Elias v. Reno*, 209 F.3d 788, 793 (5th Cir. 2000), *cert. denied*, 531 U.S. 1069 (2001).

Thus, it is irrelevant that the INS did not charge Renteria-Gonzalez with commission of an aggravated felony, but instead with unlawful entry and presence and his alien smuggling activities.[4] The transitional rule applies regardless.

Based on these sections of the post-IIRIRA INA, the INS makes an elegantly logical argument against jurisdiction. Renteria-Gonzalez was convicted of transporting illegal aliens under § 1324(a). A § 1324(a) conviction is an "aggravated felony" under IIRIRA. An aggravated felony is a deportable criminal offense under § 1227(a)(2)(A)(iii), and IIRIRA § 309(c)(4)(G) withdraws jurisdiction to review a final order of removal

---

[4] Section 1227(a)(1)(E)(i) covers conduct similar to that encompassed by § 1324(a) but does not requires a criminal conviction before an alien may be deported for alien smuggling.

4

against an alien deportable "by reason of having committed" an aggravated felony. Q.E.D., the INS argues, IIRIRA § 309(c)(4)(G) bars judicial review in this case.

## B.

Renteria-Gonzalez responds to the INS's argument with two contentions. First, he reasons that he no longer has a conviction, because the district court vacated his conviction in 1992. Second, he argues that his conviction of transporting illegal aliens, even if it remains valid, did not qualify as an "aggravated felony" under pre-IIRIRA immigration law and thus is not a jurisdiction-stripping offense under IIRIRA § 309(c)(4)(G). Renteria-Gonzalez errs in saying that his conviction is vacated for purposes of the immigration laws, but he is correct that his conviction did not qualify as an "aggravated felony" under pre-IIRIRA immigration law.

### 1.

Renteria-Gonzalez contends that he no longer has a conviction, because the district court vacated his conviction in 1992. The INS responds that the Order to Vacate is null for lack of subject matter jurisdiction or, in the alternative, that a properly vacated federal conviction remains valid for purposes of the immigration laws, even if a district court has purported to vacate the conviction to avoid the immigration-related consequences of the conviction. We conclude that, though the INS may not now collaterally attack the Order to Vacate, the vacated conviction remains valid for purposes of the immigration laws.

### a.

The district court committed several errors of law when it vacated Renteria-Gonzalez's conviction. First, it lacked statutory authority. As the magistrate judge's report and recommendation indicates, the court vacated Renteria-Gonzalez's conviction solely because of the 1990 JRAD and the perceived inequity of deporting him. The Immigration Act of 1990, however, rescinded all JRAD's, whether issued "before, on, or after" November 29, 1990. Pub. L. No. 101-649, § 505, 104 Stat. 4978, 5050 (1990).

Thus, Renteria-Gonzalez's JRAD was no longer effective in 1992 when the court relied on it to vacate his conviction. Yet, the court did not even consider the retroactive effect of § 505.[5] In other words, the court had no statutory ground whatsoever to vacate the conviction.

Second, the district court lacked *equitable* authority to vacate the conviction. "[N]o adequate statutory or historical warrant" authorizes the federal courts to add new equitable remedies to the federal post-conviction remedial scheme. *United States v. Reyes*, 945 F.2d 862, 866 (5th Cir. 1991). This principle applies with special force to the immigration laws. When a court vacates an otherwise final and valid conviction on equitable grounds merely to avoid the immigration-law consequences of the conviction, it usurps Congress's plenary power to set the terms and conditions of American citizenship and the executive's dis-

---

[5] Every circuit to address the question has held that § 505 retroactively rescinded all JRAD's and did not thereby violate the Ex Post Facto Clause. *See United States v. Yacoubian*, 24 F.3d 1 (9th Cir. 1994); *United States v. Koziel*, 954 F.2d 831 (2d Cir. 1992); *United States v. Bodre*, 948 F.2d 28 (1st Cir. 1991). We had not addressed this question when the district court vacated Renteria-Gonzalez's conviction, and still have not.

cretion to administer the immigration laws. *Plyler v. Doe*, 457 U.S. 202, 225 (1992); *Reyes*, 945 F.2d at 866.

A purely equitable order to vacate a conviction also encroaches on the President's power and discretion to pardon. *Reyes*, 945 F.2d at 866. "Absent a clearer statutory or historical basis, an article III court should not arrogate such power unto itself." *Id.* Although the court fashioned its Order to Vacate a "Writ for Relief from Judgment" under the All Writs Act, 28 U.S.C. § 1651, and *Reyes* involved a petition for a writ of *audita querela*, we have extended *Reyes* to a petition for relief from judgment under the All Writs Act. *United States v. Banda*, 1 F.3d 354, 356 (5th Cir. 1993).

Third, and most seriously, the district court probably lacked subject matter jurisdiction to vacate Renteria-Gonzalez's conviction. The magistrate judge's report does not address the statutory source of the court's jurisdiction to vacate. The district court presumably relied on the general federal question statute, 28 U.S.C. § 1331, and fashioned the Order to Vacate under the All Writs Act, which allows the federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651.

The district court apparently thought that the Order to Vacate was necessary to enforce its earlier JRAD. After the Immigration Act of 1990, however, this rationale no longer could supply a jurisdictional hook, because the JRAD was void. Moreover, the All Writs Act does not confer an independent basis for subject matter jurisdiction. *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977); *Newby v. Enron Corp.*, 302 F.3d 295, 300 (5th Cir.

2002).[6]

Notwithstanding these many errors, however, the INS cannot collaterally attack the Order to Vacate, even for want of jurisdiction, because it did not directly appeal that order in 1992SSan appeal in which it likely would have been successful.[7] We therefore must treat the Order to Vacate as proper in every respect, so we turn to INS's alternative argument, i.e., that a vacated federal conviction remains valid for purposes of the immigration laws.

b.

Even if, *arguendo,* the Order to Vacate was proper, Renteria-Gonzalez's conviction remains valid for purposes of the immigration laws. The INA defines "conviction" as

> with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication has been withheld, where—

---

[6] The Second Circuit has held that a district court does not retain jurisdiction to enforce a void JRAD after the Immigration Act of 1990. *United States v. Tablie*, 166 F.3d 505, 506-07 (2d Cir. 1999). *But see United States v. Yacoubian*, 24 F.3d 1, 5-6 (9th Cir. 1994) (holding that district court retained jurisdiction).

[7] *See Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 377 (1940) (holding that a "decree sustaining [subject matter] jurisdiction against attack, while open to direct review, is *res judicata* in a collateral action"); *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 960 F.2d 1286, 1293 (5th Cir. 1992) ("If the parties against whom judgment was rendered did not appeal, the judgment becomes final and the court's subject matter jurisdiction is insulated from collateral attack.").

6

(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

8 U.S.C. § 1101(a)(48)(A).

No court has addressed the precise question posed by this case, i.e., whether a vacated federal conviction remains valid under § 1101(a)-(48)(A) as a deportable offense and thus as a bar to judicial review under the jurisdictional sections of IIRIRA. Although it may seem counterintuitive, the text, structure and history of the INA suggest that a vacated federal conviction does remain valid for purposes of the immigration laws. Moreover, several circuits, including this court, have held that a vacated *state* conviction remains valid under § 1101-(a)(48)(A)[8]; their persuasive reasoning applies with equal force to a vacated *federal* conviction.

The most remarkable thing about how the INA defines "conviction" is that it defines it at all. "Conviction" is a commonly used word among lawyers and laymen. The INA would have been perfectly comprehensible without a definition of "conviction," or at least no more ambiguous than with such a definition. And, indeed, the INA did not define "conviction" until the enactment of IIRIRA.[9] By adding this definition, Congress must have intended it to displace any intuitive, popular, or common-sense understanding."

Section 1101(a)(48)(A) notably omits any exception for vacated convictions.[10] If Congress had not wanted vacated convictions to remain valid for the purpose of the immigration laws, it easily could have included an exception for vacated convictions in the statutory definition. The problem of vacated convictions occurred frequently enough that Congress must have anticipated the problem, yet it chose to remain silent. This lack of an exception for vacated convictions in § 1101(a)(48)(A) strongly implies that Congress did not intend any such exception.

Moreover, the INA proves that Congress knew how to write exceptions for certain kinds of post-conviction relief. Section 1227(a)(2) defines classes of aliens deportable because of certain criminal offenses. As explained *supra* part II.A, an alien deportable for these offenses

---

[8] According to the BIA's interpretation, vacated state convictions remain valid under § 1101-(a)(48)(A). *In re Roldan-Santoyo*, 22 I. & N. Dec. 512 (B.I.A. 1999). The BIA has not addressed the precise question whether a vacated federal conviction remains valid under § 1101(a)(48)(A). Thus, we are not required to give *Chevron* deference to the agency's interpretation in *Roldan-Santoyo*. But even if the two questions are similar enough to come within the *Chevron* framework, we have held that § 1101(a)(48)(A) plainly speaks to the precise question of a vacated state conviction, and therefore the *Chevron* analysis stops at step one. *Moosa v. INS*, 171 F.3d 994, 1010 n.9 (5th Cir. 1999).

[9] *Moosa*, 171 F.3d at 1008 ("Again, it is important to note that, prior to the enactment of IIRIRA § 322(a) [8 U.S.C. § 1101(a)(48)(A)], there was no definition of "conviction" in the immigration laws.").

[10] *See United States v. Campbell*, 167 F.3d 94, 98 (2d Cir. 1999) ("[N]o provision excepts from this definition a conviction that has been vacated.").

may not obtain judicial review under either the transitional or the permanent rule. Section 1227(a)(2)(A)(v), however, states that convictions for some of these offenses are not grounds for deportation if the convicted alien receives "a full and unconditional pardon by the President of the United States or by the Governor of any of the several States." Just as a pardoned conviction for these offenses is not grounds for deportation, it also is not a jurisdiction-stripping offense under either the transitional or the permanent rule. Section 1227(a)(2)(A)(v) thus creates an exception to the definition of "conviction" in § 1101(a)(48)(A) for certain pardoned convictions.

Congress therefore knew how to create exceptions to § 1101(a)(48)(A). That it included no exception for judicially vacated convictions likely indicates that it merely wanted to restrict to only the most directly accountable officers the power to negate a conviction and thereby block deportation.

The state of the law before Congress adopted § 1101(a)(48)(A) in 1996 further shows that it specifically intended a vacated conviction to remain valid for the purpose of the immigration laws. The BIA had struggled with the meaning of "conviction" for years. *Murillo-Espinoza v. INS*, 261 F.3d 771, 774 (9th Cir. 2001). "Frustrated by the crazy quilt of anomalous results that flowed from widely disparate state rehabilitative and diversionary arrangements," *Herrera-Inirio v. INS*, 208 F.3d 299, 305 (1st Cir. 2000), the BIA finally adopted a three-part definition of "conviction" in *In re Ozkok*, 19 I. & N. Dec. 546 (B.I.A. 1998). The *Ozkok* test for a "conviction" required that (1) an alien plead or be found guilty, (2) a judge order some kind of restraint or punishment, and, (3) if not entered contemporaneously with the punishment, a judgment of guilt could be entered without further proceedings relating to guilt if the alien violated his probation or other court order. *Id.* at 551-52.

"This effort failed to produce the desired uniformity and Congress stepped in to fill the void." *Herrera-Inirio*, 208 F.3d at 306. Consequently, § 1101(a)(48)(A) expanded the *Ozkok* test by adding the first half of the definition ("formal judgment of guilt of the alien entered by a court") and by omitting the third part of the *Ozkok* test in the second half of the definition. Moreover, Congress "*deliberately* broaden[ed] the scope of the definition of 'conviction' beyond that adopted by the Board . . . in *Matter of Ozkok*." H.R. CONF. REP. NO. 104-828, at 224 (1996) (quoted in *Moosa*, 171 F.3d at 1002). In *Moosa*, we held that Congress meant what it said in the plain text of section 1101(a)(48)(A): "Congress was well aware of the varying interpretations of 'conviction,' but chose to enact the current definition." 171 F.3d at 1008.

This analysis suggests that a vacated conviction, federal or state, remains valid for purposes of the immigration laws, and five circuits, including this court, have concluded that a vacated or otherwise expunged state conviction remains valid under § 1101(a)-(48)(A).[11] Although no court has addressed

---

[11] *See, e.g., Herrera-Inirio*, 208 F.3d at 304-06 (First Circuit) (state delayed adjudication of guilt); *Campbell*, 167 F.3d at 96-98 (Second Circuit) (federal sentencing case); *Nwandu v. Crocetti*, 8 Fed. Appx. 162, 167 n.8 (4th Cir. 2001) (foreign conviction vacated) (*dictum*); *Moosa*, 171 F.3d at 999-1003, 1005-10 (Fifth Circuit) (state delayed adjudication of guilt); *Murillo-Espinoza*, 261 F.3d (continued...)

8

the closely related question whether a vacated federal conviction remains valid under § 1101-(a)(48)(A), we see no good reason that this textual, structural, and historical analysis from the state conviction cases should not apply with equal force to a vacated federal conviction.

Furthermore, the policies behind these casesSSuniformity of federal law and consistency in enforcement of the immigration lawsSSextend to a vacated federal conviction, as well. If the meaning of "conviction" depended on state penal law, § 1101(a)(48)(A) could never obtain a uniform interpretation, and aliens convicted of identical crimes would face different immigration consequences based on the fortuity of the state in which they committed their crimes. The unbridled discretion of federal judges would lead to these same vices as surely as would the vagaries of state law.

If anyone is to have this kind of discretion in the enforcement of the immigration laws, it should be the executive branch, which "must exercise especially sensitive political functions that implicate foreign relations." *INS v. Abudu*, 485 U.S. 94, 110 (1988). We conclude, therefore, that the Order to Vacate does not affect Renteria-Gonzalez's conviction for the purpose of the immigration laws, so the conviction remains valid under § 1101(a)-(48)(A).

### 2.

Although, for purposes of the immigration laws, Renteria-Gonzalez still has a conviction for transporting illegal aliens, the question remains whether this conviction is an "aggravated felony" conviction that bars judicial review. We decide that the conviction does not qualify as an "aggravated felony" under the INA "as in effect as of the date of the enactment of" IIRIRA, so IIRIRA § 309(c)(4)(G) does not deprive us of jurisdiction.

The INS's argument presupposes that Renteria-Gonzalez's conviction for illegally transporting aliens is an "aggravated felony." The INS, however, has confused the IIRIRA definition of "aggravated felony" with the pre-IIRIRA definition(s).

The INS doubtless is correct that a conviction for transporting illegal aliens is, literally by definition, an "aggravated felony" under IIRIRA. 8 U.S.C. § 1101(a)(43)(N); *Ruiz-Romero*, 205 F.3d at 840. Moreover, IIRIRA makes this new definition retroactive "regardless of when the conviction occurred." IIRIRA § 321(c). Thus, if Renteria-Gonzalez had been convicted after IIRIRA became effective, his conviction alone would be grounds for deportation. 8 U.S.C. § 1227(a)(2)(A)(iii). Likewise, if the INS had begun deportation proceedings against him after IIRIRA took effect, his conviction for transporting illegal aliens would be a jurisdiction-stripping offense under the permanent rule, which uses the IIRIRA definition of "aggravated felony" and applies retroactively to pre-IIRIRA convictions. 8 U.S.C. § 1252(a)(2)(C); IIRIRA § 306(b).[12]

_____

[11](...continued)
at 773-74 (Ninth Circuit) (state conviction vacated).

_____

[12] Of course, this analysis would apply also to any alien with a post-IIRIRA conviction of transporting illegal aliens or with a pre-IIRIRA conviction of transporting illegal aliens but whose deportation proceedings did not begin until after IIRIRA became effective.

Nonetheless, the transitional rule governs the INS's proceedings against Renteria-Gonzalez, and that rule does not use the new, post-IIRIRA definition of "aggravated felony." As mentioned *supra* part II.A, the transitional rules and the permanent rules differ in only one material respect, but that difference tips the balance in this case. IIRIRA § 309(c)(4)(G) withdraws jurisdiction over a final order of removal against an alien who is deportable by reason of having committed an "aggravated felony" under the INA "as in effect as of the date of the enactment of [IIRIRA]." We therefore must apply the definition of "aggravated felony" in effect on September 30, 1996, to determine whether IIRIRA § 309(c)-(4)(G) withdraws our jurisdiction in this case.

Congress has amended the definition of "aggravated felony" in the INA four times since Renteria-Gonzalez's conviction. Unlike IIRIRA, however, most of these amendments were not retroactive. Instead, each amendment applied only to convictions adjudged on or after the date of that respective amendment, so superseded definitions still govern past convictions. Thus, we look to the codified definition of "aggravated felony" at the time of Renteria-Gonzalez's conviction.

The definition of "aggravated felony" in October 1989 included only murder, drug trafficking, weapons trafficking, or an attempt to commit these crimes. 8 U.S.C. § 1101(a)(43) (1988). Thus, Renteria-Gonzalez's § 1324(a) conviction for transporting illegal aliens did not qualify as an "aggravated felony" under the INA "as in effect as of the date of the enactment of [IIRIRA]."[13] Without a qualifying

"aggravated felony," we have appellate jurisdiction, and IIRIRA § 309(c)(4)(G) does not bar judicial review of Renteria-Gonzalez's petition on the merits,[14] to which we now turn.

---

(...continued)

Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Under AEDPA, the definition of "aggravated felony" included a § 1324(a) conviction for which the term of imprisonment imposed was at least five years. AEDPA § 440(e)(3). AEDPA further made this definition retroactive as if it had been included in § 222 of the Immigration and Nationality Technical Corrections Act of 1994, Pub. L. No. 103-416, § 222, 108 Stat. 4305, 4320 (1994) ("INTCA"). AEDPA § 440(f). The INTCA amendments applied only to convictions "entered on or after the date of enactment of [INTCA]." INTCA § 222(b). Thus, the older definition of "aggravated felony" still governed Renteria-Gonzalez's conviction, notwithstanding the INTCA, AEDPA, and IIRIRA amendments.

Even if the AEDPA amendments controlled under IIRIRA § 309(c)(4)(G), however, our conclusion would be no different. AEDPA included a § 1324(a) conviction in the definition of "aggravated felony" only if the alien received a sentence of imprisonment of at least five years, AEDPA § 440(e)(3), but Renteria-Gonzalez received a six-month sentence.

[14] In general, IIRIRA dramatically restricts judicial review of final orders of removal. As we observed in *Nguyen v. INS*, 117 F.3d 206, 207 (5th Cir. 1997), IIRIRA § 309(c)(4)(G) "completely forecloses our jurisdiction to review decisions of the [BIA]." Our decision today does not challenge or alter our holding in *Nguyen*; we conclude only that Renteria-Gonzalez has not committed a jurisdiction-stripping offense under IIRIRA § 309-(c)(4)(G).

This conclusion applies only in the rare instance (continued...)

---

[13] On September 30, 1996, Congress had most recently amended the INA in the Antiterrorism and (continued...)

10

### III.

On two grounds, Renteria-Gonzalez urges this court to grant his petition and reverse the final order of removal. First, he argues that he did not receive a fair hearing before the IJ. Second, he contends that the IJ and BIA lacked jurisdiction because the INS had not properly terminated his temporary resident status before instituting deportation proceedings. Concluding that substantial evidence supports the BIA's decision, we deny the petition for review.

### A.

We generally review only the decision of the BIA, not that of the IJ. *Carbajal-Gonzalez v. INS*, 78 F.3d 194, 197 (5th Cir. 1996). The IJ's errors are relevant only insofar as they affect the BIA's decision. *Id.* We defer to the BIA's factual findings if they are supported by substantial evidence. *Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir. 1997). The substantial evidence standard requires only that the BIA's decision have some basis in fact, not that we necessarily agree with that board. *Carbajal-Gonzalez*, 78 F.3d at 197. We will affirm the BIA's decision unless the evidence compels a contrary conclusion, i.e., if no reasonable factfinder could have agreed with the BIA. *Id.*

### B.

Renteria-Gonzalez argues that, for two reasons, his hearing was unfair: (1) the INS did not make reasonable efforts to locate and produce the illegal aliens he transported, and (2) the IJ did not let him test, on cross-examination, Horger's knowledge of Spanish. We disagree with both assertions.

### 1.

Renteria-Gonzalez insists that the INS failed in its duty to produce, or attempt to produce, the illegal aliens he transported. Instead, the INS produced only Horger, who testified to the aliens' statements that Renteria-Gonzalez and his accomplice, Bautista-Garcia, had picked them up in Mexico for a fee.[15] The INS also produced several Forms I-213, which Horger used to record the aliens' statements during his investigation.

Renteria-Gonzalez contends that this failure to produce the aliens is unfair under *Hernandez-Garza v. INS*, 882 F.2d 945, 948 (5th Cir. 1989), which held that "the use of affidavits from persons who are not available for cross-examination does not satisfy the constitutional test of fundamental fairness unless the INS first establishes that despite reasonable efforts it was unable to secure the presence of the witness at the hearing." In *Hernandez-Garza*, we held that the INS did not satisfy this standard where an INS attorney merely testified that he had sent letters to the absent aliens but could not produce the copies

---

(...continued)
of a criminal alien (1) whose deportation proceedings began before April 1, 1997, and ended more than thirty days after September 30, 1996, and (2) whose conviction qualifies as a jurisdiction-stripping offense under the IIRIRA definitions but not under the pre-IIRIRA definitions. It just so happens that Renteria-Gonzalez fits into this unusual category.

[15] The INS did not rely on Renteria-Gonzalez's conviction at the hearing before the IJ, presumably because the agency had concluded that the Order to Vacate barred its use. The Order to Vacate did not bar the deportation proceeding altogether, though, because to deport an alien, the INA requires only a *showing* of, not a *conviction* of, unlawful presence in the United States and alien smuggling activities. 8 U.S.C. § 1227(a)(1)(B), (E)(i).

of the letters. *Id.*

*Hernandez-Garza* is distinguishable from Renteria-Gonzalez's situation in two important ways. First, the INS relied on Horger's testimony, whereas in *Hernandez-Garza* the INS relied on affidavits. The holding of *Hernandez-Garza* was expressly limited to affidavits, and justifiably so.

Even if one supposes that Horger was lying about the aliens' statementsSSand not even Renteria-Gonzalez asserts he wasSSRenteria-Gonzalez had the opportunity to cross-examine Horger about the statements. The IJ, therefore, could examine Horger's demeanor and tone to ascertain his credibility, which affects the weight given to the statements much more than would the mere reading of a lifeless affidavit. Moreover, Horger's testimony about the aliens' statements was corroborated by the Forms I-213, which another circuit has deemed "reliable document[s]." *Guerrero-Perez v. INS*, 242 F.3d 727, 729 n.2 (7th Cir. 2001).[16]

Other evidence at the hearing buttressed Horger's testimony and undermined Renteria-Gonzalez's credibility. For example, Renteria-Gonzalez concealed his temporary residence card in his sock and did not produce the card when asked by Horger. Renteria-Gonzalez also lied about his temporary resident status, claiming, under interrogation by Horger, to be an illegal alien.

Furthermore, Renteria-Gonzalez and his accomplice, Bautista-Garcia, contradicted each other in their respective testimony. For instance, Renteria-Gonzalez testified that he and Bautista-Garcia shopped for several hours in Brownsville the day before their arrest, whereas Bautista-Garcia testified that they remained in their hotel all day. Such evidence, coupled with Horger's inherent credibility, justified the IJ's decision to credit Horger and to discredit Renteria-Gonzalez.

Second, Renteria-Gonzalez does not dispute that the INS attempted to locate and produce the aliens; he argues only that the agency did not employ the most effective means. By contrast, the petitioner in *Hernandez-Garza* asserted that the INS had not even attempted to locate and produce the aliens.

The INS admittedly did not make a herculean effort to locate the alien witnesses in the instant matter; its attorney told the IJ that he had conducted "CIS searches" for the five aliens.[17] Renteria-Gonzalez concedes that the INS in fact conducted this search but objects that it was not reasonably calculated to locate and produce the aliens. He contends that the INS could have mailed letters to the alien's known addresses in Mexico, though he admits "the chances of success would have been minuscule."

In *Hernandez-Garza*, however, the INS asserted that it sent letters to the aliens but could not produce copies of all the letters. *Hernandez-Garza*, 882 F.2d at 948. The petitioner

---

[16] Insofar as Renteria-Gonzalez makes a hearsay-type objection to the use of the Forms I-213, we observe that these documents come within the public records exception to the hearsay rule, FED. R. EVID. 803(8), not that the hearsay rules apply to deportation proceedings in the first place, *Olabanji v. INS*, 973 F.2d 1232, 1234 (5th Cir. 1992).

[17] According to Renteria-Gonzalez, CIS is a law enforcement database; otherwise, the record does not contain any information about CIS or the likelihood of success of a CIS search.

12

there argued that the INS had not sent the letters at all, and the court seemed to agree, holding that the attorney's assertions, without copies of the letters, could not establish that the INS had made reasonable efforts to locate and produce the aliens. *Id.* Because Renteria-Gonzalez admits that the INS conducted the search, he is left with the heavy burden of demonstrating that the search was not a reasonable effort. The IJ understandably concluded that Renteria-Gonzalez had not satisfied this burden with the bald assertion that letters might have been more successful.

Not only is *Hernandez-Garza* distinguishable, but Renteria-Gonzalez stumbles several times on appeal as he contends that the INS did not make reasonable efforts to locate and produce the aliens under the reasoning of *Hernandez-Garza*. First, Renteria-Gonzalez does not dispute Horger's veracity, and "people may not assert a cross-examination right to prevent the government from establishing uncontested facts." *Olabanji*, 973 F.2d at 1234 n.1. Second, Renteria-Gonzalez concedes the futility of attempting to locate the aliens by letter in Mexico, which amounts to conceding the reasonableness of the INS's efforts.

Third, Renteria-Gonzalez never explains how the INS could have compelled the presence of the aliens at an administrative hearing in the United States, even if the agency had successfully written to them in Mexico. Given the distinctions between *Hernandez-Garza* and this case and Renteria-Gonzalez's admissions, the BIA had substantial evidence to conclude that the INS's failure to produce the aliens did not result in an unfair hearing.

2.

Renteria-Gonzalez insists that, on cross-examination, the IJ did not let him test Horger's knowledge of Spanish; he hypothesizes that Horger did not fully understand Spanish and therefore misunderstood the aliens' statements to him. Renteria-Gonzalez contends that under *Hernandez-Garza*, he had a right to test Horger's knowledge of Spanish, because Horger's language skills "were critical if the [immigration] judge was to admit and give credence" to his testimony. *Hernandez-Garza*, 882 F.2d at 948. Renteria-Gonzalez argues that the IJ denied him this right by not allowing Renteria-Gonzalez's counsel to test Horger's knowledge of Spanish by having Horger speak with Renteria-Gonzalez in the presence of the interpreter, who then could testify to Horger's knowledge of Spanish.

This argument is almost frivolous. *Hernandez-Garza* is easily distinguishable. There, defense counsel asked agents to translate a written document from Spanish to English, so the IJ could test the agents' translations against the interpreter's translation. 882 F.2d at 948. The *Hernandez-Garza* court held that the IJ had erred by refusing to allow this test, because the interpreter merely would have performed his ordinary duty by translating the document for the IJ to test against the agents' translations.

In the instant case, however, Renteria-Gonzalez wanted the interpreter to become an independent witness to the Spanish conversation between Renteria-Gonzalez and Horger.[18] More importantly, the IJ told Renteria-Gonzalez that "[i]f you want to find some other way to address his competence in Spanish, you're free to do it, but not that way." The BIA therefore had substantial

---

[18] The IJ did not speak Spanish and hence could not evaluate the conversation himself.

evidence to conclude that Renteria-Gonzalez had a fair opportunity to test Horger's knowledge of Spanish.

C.

Renteria-Gonzalez avers that the BIA and IJ lacked jurisdiction over his deportation proceedings. Before it may begin deportation proceedings against an alien who has committed a deportable offense, the INS must terminate his temporary resident status. *In re Medrano*, 20 I. & N. Dec. 216 (B.I.A. 1990).

The INS sent Renteria-Gonzalez a notice of intent to terminate his temporary resident status in September 1991 and terminated his status in November 1991. The LAU affirmed the termination in July 1992, and the INS did not begin deportation proceedings until January 1994, when it sent Renteria-Gonzalez an order to show cause. Renteria-Gonzalez, however, contends that his temporary resident status was not properly terminated, because the September 1991 notice cited the incorrect section of the INA as the grounds for termination.[19] And, because the INS did not properly terminate his temporary resident status, Renteria-Gonzalez reasons that the BIA and IJ lacked jurisdiction under *Medrano*.

The scrivener's error in the September 1991 notice did not nullify the termination of Renteria-Gonzalez's temporary resident status. Despite that error, the text of the notice unambiguously notified Renteria-Gonzalez of the reason for termination: "[Y]ou were con-victed of Transporting an Illegal Alien Within the United States, a felony offense. This conviction renders you ineligible for temporary resident status."

The Ninth Circuit recently and summarily rejected an identical argument, holding that the petitioner "had sufficient notice of the conviction underlying his deportation proceedings, and any error in the Notice to Appear was harmless." *Chowdhury v. INS*, 249 F.3d 970, 973 n.2 (9th Cir. 2001). Moreover, Renteria-Gonzalez obviously understood the INS's intent and its reason for termination, because he rushed into district court shortly after receiving the September 1991 notice and asked the court to vacate his conviction.

Renteria-Gonzalez cannot now feign ignorance. The September 1991 notice plainly was sufficient.[20]

The petition for review is DENIED.

ENDRECORD

---

[19] The September 1991 notice of intent to terminate cited former § 245A(b)(2)(A), 8 U.S.C. § 1255a(b)(2)(A) (1988), but it should have cited former § 245A(b)(2)(B)(i)-(ii), 8 U.S.C. § 1255a-(b)(2)(B)(i)-(ii) (1988).

[20] In a stroke of boldness, Renteria-Gonzalez also contends that the INS, so far from having the power to deport him, had an affirmative duty to legalize his temporary resident status into permanent resident status. To the contrary, however, because the scrivener's error in the September 1991 notice was harmless, the INS effectively terminated his temporary resident status, leaving no residency status at all to adjust to permanent status.

BENAVIDES, Circuit Judge, Specially Concurring:

Although I would reach the same result as the majority in the case at bar, I write separately because section II(B)(1)(b) of the majority opinion paints with too broad a brush with respect to whether a vacated conviction falls within the purview of the definition found in 8 U.S.C. § 1101(a)(48)(A). Section 1101(a)(48)(A) provides that:

> The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where–
>
> > (I) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
> >
> > (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

The majority states that five circuits,[21] including this Court, have concluded that a "vacated or otherwise expunged state conviction remains valid under § 1101(a)(48)(A)." Maj. op. at 8.[22]

---

[21] *Herrera-Inirio v. I.N.S.,* 208 F.3d 299, 304-06 (1st Cir. 2000) (state delayed adjudication of guilt); *United States v. Campbell,* 167 F.3d 94, 96-98 (2d Cir. 1999) (federal sentencing case); *Nwandu v. Crocetti*, 8 Fed. Appx. 162, 167 n.8 (4th Cir. 2001) (foreign conviction allegedly expunged); *Moosa v. I.N.S.,* 171 F.3d 994, 1005-06 (5th Cir. 1999) (state delayed adjudication of guilt); *Murillo-Espinoza v. I.N.S.,* 261 F.3d 771, 773-74 (9th Cir. 2001) (state conviction expunged).

[22] Additionally, the Eleventh Circuit, in the context of an equal protection challenge, has held that an expunged California conviction qualified as a conviction under § 1101(a)(48)(A) and, thus, could serve as a basis for removal. *See Fernandez-Bernal v. Attorney Gen.,* 257 F.3d 1304, 1312-17 (11th Cir. 2001). In that opinion, the Eleventh Circuit opined that there was a "budding disagreement" with respect to whether § 1101(a)(48)(A) "wholly negate[d] the effect on removal cases of all state rehabilitative measures that purport to expunge or otherwise remove a conviction or other record of guilt." *Id.* at 1314 (citing inter alia *Lujan-Armendariz v. I.N.S.*, 222 F.3d 728 (9th Cir. 2000)). However, since the Eleventh Circuit's opinion in *Fernandez-Bernal,* the Ninth Circuit has fallen in line with the other courts that have addressed the issue. *See Murillo-Espinoza v. I.N.S.,* 261 F.3d 771 (9th Cir. 2001). In *Murillo-Espinoza,* the Ninth Circuit deferred to the Board of Immigration Appeals and held that, in enacting § 1101(a)(48)(A), "Congress intended to establish a uniform federal rule that precluded the recognition of subsequent state rehabilitative expungements of convictions." *Id.* at 774 (citing *In re Roldan-Santoyo*, Int. Dec. 3377, 1999 WL 126433 (BIA 1999)

(continued...)

Although I have no quarrel with the proposition that convictions vacated pursuant to rehabilitative provisions or expunged convictions remain valid for the purposes of § 1101(a)(48)(a), I would emphasize that none of the convictions in the five cases cited by the majority was vacated based on the merits of the underlying criminal proceeding, *i.e.,* a violation of a statutory or constitutional right with respect to the criminal conviction. Indeed, as set forth below, two of those sister circuit opinions contain language recognizing a distinction between the two categories of vacaturs: vacaturs on the merits versus rehabilitative vacaturs.

In *Moosa v. I.N.S.,* 171 F.3d 994 (5th Cir. 1999), an immigration case, we addressed the question whether the petitioner's successful completion of his deferred adjudication in Texas constituted a conviction within the meaning of § 1101(a)(48)(A). Applying the plain language of the statute, we held that because Moosa had entered a plea of guilty, and the judge had imposed a punishment, § 1101(a)(48)(A) encompassed a Texas deferred adjudication. *Id.* at 1005-06. We also stated that this conclusion was in accord with the Second Circuit's opinion in *United States v. Campbell,* 167 F.3d 94 (2d Cir. 1999). *Moosa*, 171 F.3d at 1006. In *Campbell,* a federal sentencing guidelines appeal, the defendant's sentence was enhanced based on a Texas conviction that had been set aside upon the defendant's successful completion of probation. More specifically, the sentencing guidelines provided that a defendant's offense level should be increased by sixteen steps if he had been convicted of an "aggravated felony" prior to deportation. U.S.S.G. § 2L1.2(b)(2) (1995)). In rejecting the defendant's argument that the enhancement should not apply because his state conviction had been "vacated," the court opined that the immigration laws do not indicate that "they are to be interpreted

[22](...continued)
(en banc), *order vacated on other grounds sub nom. Lujan-Armendariz*, 222 F.3d 728 (9th Cir. 2000)).

16

in accordance with state law." *Id.* at 97. After quoting the definition of conviction in § 1101(a)(48)(A), the Court recognized that "[n]o pertinent provision in Title 8 gives controlling effect to state law. And no provision excepts from this definition a conviction that has been vacated." *Id.* at 98. The Court concluded that because there was "no pertinent provision in either the immigration statute or the Guidelines to suggest the applicability of state law, the question of whether a vacated conviction remains a conviction for purposes of § 1326(b) and Guidelines § 2L1.2 is . . . a question of federal law." *Id.* The Second Circuit explained that the "vacated" or "set aside" conviction did qualify as a conviction upon which to base the enhancement because: (1) the defendant's state conviction had been set aside *solely* because his period of probation had expired and the conditions of probation had been satisfactorily fulfilled; and (2) "[h]is conviction was not reversed, and the vacatur order was not based on any showing of innocence or on any suggestion that the conviction had been improperly obtained." *Id.* Thus, the Court held that, for purposes of immigration offenses, the vacatur order did not alter the conviction of the aggravated felony. *Id.*

Subsequently, the First Circuit has concluded that "state rehabilitative programs that have the effect of vacating a conviction *other than on the merits or on a basis tied to the violation of a statutory or constitutional right in the underlying criminal case* have no bearing in determining whether an alien is to be considered 'convicted' under section 1101(a)(48)(A)." *Herrera-Inirio v. I.N.S.,* 208 F.3d 299, 305 (1st Cir. 2000) (emphasis added) (citing *inter alia Campbell,* 167 F.3d at 98). The First Circuit further quoted at length from a committee report attached to the IIRIRA that indicated Congress's intent to broaden the definition of conviction by including "situations where a judgment of guilt or imposition of sentence is suspended, conditioned upon the alien's future good behavior." *Herrerra-Inirio*, 208 F.3d at 305 (quoting H.R. Conf. Rep. No. 104-828, at 24 (1996))

17

(other citation omitted). Based on this report, the First Circuit concluded that the "emphasis that Congress placed on the *original* admission of guilt plainly indicates that a subsequent dismissal of charges, based solely on rehabilitative goals and not on the merits of the charge or on a defect in the underlying criminal proceedings, does not vitiate that original admission." *Id.* at 305 (emphasis in original). Moreover, the Seventh Circuit, relying upon a decision of the Board of Immigration Appeals,[23] held that a state conviction vacated during a post-conviction scheme to remedy a constitutional violation does *not* constitute a conviction as set forth in § 1101(a)(48)(A). *Sandoval v. I.N.S.,* 240 F.3d 577, 583-84 (7th Cir. 2001).

The common thread running through the above cases is that convictions set aside or vacated based on events subsequent to the conviction–not because of a defect in the conviction itself–constitute convictions within the meaning of § 1101(a)(48)(A). Likewise, in the instant case, Renteria's conviction was not vacated because there was a valid challenge to the underlying criminal proceedings. Thus, although I agree that the above cases indicate that Renteria's vacated conviction qualifies as a conviction under § 1101(a)(48)(A), I would tailor the analysis more narrowly to the facts at issue. Specifically, I would distinguish the instant vacatur from cases involving convictions vacated because of a defect in the criminal proceedings.

Finally, the majority opinion states that "[a]lthough it may seem counterintuitive, the text, structure

---

[23] In *In re RODRIGUEZ-RUIZ,* Interim Decision 3436, 2000 WL 1375514 (BIA 2000), an immigration judge denied Rodriguez's motion to terminate the removal proceedings and found him removable based on his felony conviction that previously had been vacated pursuant to Article 440 of the New York Criminal Procedure Law. On appeal to the BIA, the INS argued that the conviction had been vacated in order to avoid removal–not because of a defect in the criminal proceedings. The BIA recognized that the order vacated the criminal conviction pursuant to a statutory provision that involved neither expungement nor rehabilitation. Citing *Campbell,* 167 F.3d 94, the BIA declined to question whether the state court "acted in accordance with its own state law . . . ." Thus, the BIA concluded that the vacated conviction did not qualify as a "conviction" under § 1101(a)(48)(A)).

18

and history of the INA *suggest* that a vacated federal conviction does remain valid for purposes of the immigration laws." Maj. Op. at 7 (emphasis added). To the extent this statement acknowledges that the plain language of § 1101(a)(48)(A) does not provide that a conviction vacated on the merits remains valid for immigration purposes, I agree.

I recognize that the provision at issue does not contain an express exception for convictions vacated based on a legal defect. Nonetheless, the majority's interpretation is in violation of the "common mandate of statutory construction to avoid absurd results." *Atchison v. Collins,* 288 F.3d 177, 181 (5th Cir. 2002). Applying the majority's holding to vacaturs based on the merits would result in what I believe to be an absurd result and certainly not in keeping with the notion of American judicial traditions. For instance, if the courts determine there was insufficient evidence, an involuntary guilty plea or a violation of other constitutional or statutory rights, we customarily vacate such a conviction. It would seem to be an absurd result to interpret the provision to encompass convictions that state or federal courts have deemed deficient on the merits. In my view, such a judicial determination operates to negate a conviction with respect to the merits.

In summary, I do not believe the majority opinion should be understood to indicate that a conviction that has been vacated or reversed based on a defect in the underlying criminal proceeding constitutes a conviction under § 1101(a)(48)(A).[24]

---

[24] Of course, any indication in the majority opinion that a conviction vacated based on the merits constitutes a conviction under § 1101(a)(48)(A) is entirely dicta in that the case at bar did not involve such a vacatur.